Paper No. 39
BAC

THIS DISPOSITION IS CITABLE AS
PRECEDENT OF THE TTAB          DEC. 4,98

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
——————

Trademark Trial and Appeal Board
——————

Recot, Inc.

v.

M. C. Becton
——————

Opposition No. 96,518
to application Serial No. 74/477,309
filed on January 7, 1994
——————

Laurence R. Hefter of Finnegan, Henderson, Farabow, Garrett
& Dunner, L.L.P. for Recot, Inc.

Mark H. Elovitz of Mark H. Elovitz, P.C. for M. C. Becton.
——————

Before Sams, Hairston and Chapman, Administrative Trademark
Judges.

Opinion by Chapman, Administrative Trademark Judge:

M. C. Becton, an individual, has applied to register

the mark FIDO LAY for "natural agricultural products,

namely, edible dog treats" (Int. Class 31).[1]

---

[1] Appl. Ser. No. 74/477,309, filed January 7, 1994.  The
application is based on applicant's bona fide intention to use
the mark in commerce.

Registration has been opposed by Recot, Inc. pursuant to Section 2(d) of the Trademark Act. In the notice of opposition, opposer asserts that through its predecessors in interest and its affiliated company, Frito-Lay, Inc., it has for many years been engaged in the manufacture, advertisement and sale of snack foods and is "the largest snack food producer in the United States, selling and advertising numerous products under the FRITO-LAY trademark, including FRITO'S corn chips, LAY'S potato chips and many other well-known snack products" (paragraph 1); that opposer has sold billions of dollars worth of snack foods under the FRITO-LAY mark throughout the U.S. and has spent hundreds of millions of dollars to advertise and promote FRITO-LAY products and the FRITO-LAY mark; that opposer's mark FRITO-LAY "has become exceedingly famous" and "is among the best-known and most famous trademarks in the United States" (paragraph 4); that in addition to manufacturing and selling snack foods, opposer also engages in the business of "licensing for manufacture, promotion, distribution and sale certain goods bearing the FRITO-LAY mark" (paragraph 5); that applicant's mark, FIDO LAY, is intended to be a slight variation of opposer's FRITO-LAY trademark and "demonstrates a willful intent to trade on the commercial magnetism and goodwill associated with opposer's famous and valuable trademark" (paragraph 7); and that applicant's mark, when

2

used on his goods, so resembles opposer's previously used

and registered marks, as to be likely to cause confusion,

mistake, or deception.  Specifically, opposer pleaded

ownership of the following six registrations[2]:

Registration No. 841,324[3]       Registration No. 876,664[4]

Registration No. 1,132,305[5]     Registration No. 1,153,318[6]

---

[2] In its notice of opposition, opposer pleaded that it "is the owner, inter alia, of the following valid and subsisting U.S. registrations for the mark FRITO-LAY and related marks" (paragraph 3).

[3] Issued December 26, 1967, Section 8 affidavit accepted, Section 15 affidavit acknowledged, renewed, for corn chips, potato chips, cheese-flavored puffed corn snack, pretzels, fried pork skins, canned chicken liver dip, dehydrated dip mixes, specifically, onion, green onion, Caesar, bleu cheese, horseradish, kosher dill, chili con queso, and bacon and cheese; cracker sandwiches, canned and packaged nut meats, popped popcorn, canned bean dip, canned beans and franks, canned lima beans and ham, canned rice, canned corned beef hash, bottled chili powder, canned enchiladas, canned chili (with and without beans), canned tamales, canned barbecue beef, canned spaghetti and meat balls, canned gravy and beef, and canned beef stew.  (Opposer's notice of opposition did not list the item "canned rice", which is included in the registration.)

[4] Issued September 9, 1969, Section 8 affidavit accepted, Section 15 affidavit acknowledged, renewed, for potato chips.

[5] Issued April 1, 1980, Section 8 accepted, for smoked beef jerky, smoked beef in stick form, potato chips, corn chips, and dehydrated dip mixes (Int. Class 29); fruit and artificially fruit-flavored mixes for making beverages containing water (Int. Class 30).

[6] Issued May 5, 1981, Section 8 affidavit accepted, Section 15 affidavit acknowledged, for confectionery.

Registration No. 1,195,825[7]    Registration No. 1,501,004[8]

In his amended answer[9] applicant has denied the salient

allegations of the notice of opposition.

The record includes the pleadings; the file of the

opposed application; opposer's testimony, with exhibits, of

Paulette Kish; stipulated affidavit testimony, with

---

[7] Issued May 18, 1982, Section 8 affidavit accepted, Section 15 affidavit acknowledged, for corn chips, potato chips, rice chips, tortilla chips, corn-based onion flavored snacks, puffed corn snacks, fried corn-based cheese flavored snacks, fried pork rinds, processed sunflower seeds, processed nuts, processed peanuts, trail snack mix (comprised of processed nuts, raisins, dates, and the like), beef jerky, beef sticks, sausage, bean dip, and enchilada dip (Int. Class 29); pretzels, candy, cookies, cakes, crackers, pies, brownies, popped popcorn, and picante sauce (Int. Class 30). (The listing set forth in opposer's notice of opposition did not include several of the items listed in the registration.)

[8] Issued August 23, 1988, Section 8 accepted, Section 15 acknowledged, for utility knives (Int. Class 8); clocks (Int. Class 14); playing cards,, pencils, pens, cardholders, and stationery type folios (Int. Class 16); umbrellas, leather key rings, and tote bags (Int. Class 18); plastic luggage tags (Int. Class 20); housewares, namely plastic drinking cups, ceramic drinking mugs, clips for sealing plastic bags, insulated coolers for food and beverages, and coasters (Int. Class 21); towels (Int. Class 24); clothing, namely shirts, shorts, sweaters, jackets, wristbands, headbands, sweatshirts, sweatpants, windbreakers and caps (Int. Class 25); non-metallic lapel pins and embroidered patches for clothing (Int. Class 26); golf balls, tees, ball markers, dominoes, balloons, and plastic flyers (Int. Class 28); and cigarette lighters (Int. Class 34). The Section 8 affidavit was partial--Int. Classes 14, 24 and 34 were not included in the Section 8 affidavit, and thus, those three classes have been cancelled under Section 8. (The listing set forth in opposer's notice of opposition did not include several of the items listed in the registration.)

[9] In a Board order dated June 21, 1995, applicant was allowed time to submit a proper answer. Applicant's amended answer was filed on July 10, 1995.

exhibits, of Marthe deRaismes Drake (offered by opposer as rebuttal); opposer's notice of reliance on status and title copies of several of opposer's pleaded registrations prepared by the Patent and Trademark Office; and applicant's testimony, with exhibits, of M. C. Becton, Steven Scott, Dick Lovelady, Patrick Siano, and Stuart Herring.

Both parties filed briefs on the case. Neither party requested an oral hearing.

In this case opposer has properly made of record, and is entitled to rely upon, six of its eight pleaded registrations.[10] Because opposer owns valid and subsisting registrations of its marks, the issue of priority does not arise with respect to the goods recited therein. See King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); McDonald's Corp. v. McClain, 37 USPQ2d 1274 (TTAB 1995); and Humana Inc. v. Humanomics Inc., 3 USPQ2d 1696 (TTAB 1987). Moreover, opposer's earlier date of use is established by the evidence submitted.

---

[10] Opposer did not submit a status and title copy of Reg. No. 890,936, issued May 12, 1970, for the mark FRITO-LAY BANDWAGON for a house organ published periodically.
 Although opposer did submit a status and title copy of Reg. No. 1,064,020, issued April 19, 1977, for the mark FRITO-LAY'S for a variety of snack food products, the status and title copy was prepared by the Patent and Trademark Office in August 1996, indicating that the mark was registered for a term of 20 years from April 19, 1977. However, the records of this Office now indicate that Reg. No. 1,064,020 expired as of April 19, 1997.

Thus, the issue in the case before the Board is whether applicant's mark FIDO LAY when applied to "natural agricultural products, namely, edible dog treats", so resembles opposer's various FRITO LAY and FRITO LAY'S marks as to be likely to cause confusion, mistake or deception within the meaning of Section 2(d) of the Trademark Act, 15 U.S.C. 1052(d).

Paulette Kish, one of opposer's senior group managers of marketing research, testified for opposer. Ms. Kish testified that opposer[11] uses the mark FRITO-LAY on tortilla chips, potato chips, multigrain chips, corn chips, cheese puffs, pretzels, a variety pack of all of those products, dips, nuts, several types of filled sandwich crackers (e.g., cheese, peanut butter), sunflower seeds, and cookies. She did not know when the various products were introduced on the market by opposer, but the majority of these products have been sold since prior to her employment at opposer in 1989, and others (such as processed nuts and seeds) have been sold for at least four years. Opposer sells its goods nationwide through retailers ranging from supermarkets,

---

[11] By agreement of the parties, Ms. Elizabeth Bilus, trademark counsel for Pepsico, Inc., the parent corporation of Frito Lay, testified during the deposition of Ms. Kish. Ms. Bilus explained for the record that opposer, Recot, Inc., is a wholly owned affiliated company of Pepsico, Inc., and it is the owner of all of the intellectual property of Pepsico, Inc., that is used by Frito Lay in association with its snack food products. The marks are used under license by Frito Lay from Recot, Inc.

convenience stores, mass merchandisers (e.g., K-Mart), club stores (e.g., Sam's), food service operators (e.g., delis), vending machine operators, and school cafeterias. Ms. Kish testified that opposer sells to "virtually everyone in the country", and that through syndicated supermarket data, which opposer purchases from a nationally recognized supplier of that data, opposer has its products in "90 percent of U.S. households at least once during the year" (Dep., p. 61); that opposer's retail sales for 1995 were about $6 billion, and for 1992 were about $5 billion; with advertising costs around $80 million in 1996, around $50 million annually from 1992-1995, and over $30 million dollars in both 1990 and 1991. According to Ms. Kish, opposer's products range in price from $.25 a bag to over $3.00 a bag; and purchasers buy the snacks on impulse (approximately 80%) as well as through planned shopping.

She testified that opposer's products are found in the main snack aisle in grocery stores and supermarkets, and opposer also utilizes "parameter display bases" (Dep., p. 41) in grocery stores and supermarkets. These displays are separate racks (e.g., cardboard racks, spinner racks, and point-of-sale displays) on which opposer displays a single product or sometimes a variety of products. She testified that opposer provides clip art of opposer's trademarks to retailers "so that they can create advertisements of their

own" (Dep., p. 9); that the retailer may cut out the clip art provided by opposer and insert it into the retailer's advertisement so there is an accurate depiction of opposer's trademark; that opposer's marketing department compiles trade materials and brochures to promote an individual event or promote an array of products; and that opposer's customers receive these materials (e.g., clip art, trade brochures about the products) which retailers can then "put in their own advertisements and featured ads in the newspaper's food section" (Dep., p. 32). She also testified that whether opposer advertises its goods in any pet product or pet business publication (e.g., "Pet Product News") was outside of her "realm of expertise". (Dep., p. 139-140).

Opposer's mark FRITO LAY is usually presented in red and white or black and white, but it sometimes appears in blue and white or with gold. Also, opposer makes a line of "Better For You" products with lower fat, and the packaging for this product line includes a green stripe down the center of the package (in the background) and a yellow smiling sun sign design within the top portion of the green stripe.

Applicant stipulated that exhibit 30 introduced at the Kish deposition is an accurate list of licensees of Recot, Inc. as to FRITO LAY marks (Dep., p. 70). That list indicated that opposer licenses various marks, including

FRITO LAY, for, inter alia, posters, various clothing items, playing cards, and train sets. She testified that to her knowledge, opposer has not licensed its marks to any entity in the dog food market. Additionally, in 1996 opposer worked in conjunction with the Disney company, and opposer merchandised its products in conjunction with the release of the movie "101 Dalmatians", including displays showing the puppies and the characters from the movie with opposer's products/trademarks shown across the top of the display.

She testified that from her personal experience supermarkets carry pet food; that she has seen dog food that looks like human food (i.e., dog snacks that look like cookies); that she is aware that there are companies which produce and sell both human food and pet food (such as Ralston Purina and Quaker); and that she has purchased dog treats (Snausages) which she recalled were made by a company owned by Quaker.

During the deposition of Ms. Kish, opposer stipulated that opposer's "products are intended for consumption by human beings" (Dep., p. 127), and that opposer's "promotional efforts are directed at humans to sell products for human consumption" (Dep., p. 130).

Applicant offered in evidence his own testimony. Mr. Becton testified that he is the sole owner of the application but he does business as M. C. Pet Specialties;

and that he and a partner, Steven Scott (his stepson), own Alabama Pet Foods, a retail store specializing in pet food and supplies, with two locations, both in the Birmingham, Alabama area. He testified that dog treats may be sold in grocery stores, but pet stores within the last few years began selling a "natural line" (Dep., p. 12) of dog treats which were not available in grocery stores; that "natural" dog treats are such items as pig ears, cow hooves, turkey feet; and that he explored this specialized market niche. In deciding on a trademark, Mr. Becton discussed the matter with his partner, Steven Scott. Mr. Becton explained that in the Alabama Pet Food stores, they allow customers to bring their pets into the stores, and generally they give the customer's pet a treat of some kind while the customer is shopping. Mr. Becton explained that he and Steven Scott chose the mark FIDO LAY because one day a customer came into the pet store with a pet dog, and Steven said to this dog, "Fido, lay" and the phrase "rang a bell." Steven liked the sound of the phrase, and he later called Mr. Becton to discuss it. Mr. Becton testified that "Fido" is a common name for a dog, and "lay" is a term used in dog training and means to lay down.

Applicant's application is based on an intent to use, but applicant commenced use of his mark in June 1995. All of applicant's goods (e.g., smoked knuckle bones, smoked

10

turkey feet, smoked pig ears) are packaged and sold in transparent plastic bags, with a yellow label with a green outline and black lettering.  After studying possible marketing methods Mr. Becton decided to hire a distributor who sells products to supermarkets.  He also testified that he is not involved in where his products are positioned in supermarkets and grocery stores, and that there are dog treats that look like human food.

Mr. Becton acknowledged that he has heard of FRITO LAY, and he has been aware of the name for "twenty, thirty years" (Dep., p. 67), but that the words FIDO LAY do not sound like FRITO LAY and his trademark was not based on FRITO LAY.  Mr. Becton also testified that he received two cease and desist letters from Pepsico, Inc., dated June 20, 1994 and July 7, 1994, but he did not respond to them, assuming they were harassment.

Steven Scott testified that he came up with the mark FIDO LAY as a dog command.  When customers bring their dogs into his pet stores, he tries to settle the dog down so he can sell to the customer.  He normally uses a pig ear as a treat because it takes a big dog five or ten minutes to eat it, which allows him time to talk to and sell to the customer.  He has no documents regarding the adoption of the mark.  He stated that the mark FIDO LAY is used on shirts and caps as advertising, utilizing the colors green and

yellow on the caps, and green and yellow with black lettering on the shirts, which are the colors used in the Alabama Pet Food stores. He testified that the products are displayed on end cap displays (which are displays placed at the end of aisles and facing out into the perimeters), or on spinner racks; and that it would be improper to place dog food items in the snack aisle and vice versa. He testified that since June 1995 between 800-1000 FIDO LAY products have been sold. He stated that FRITO LAY is a very well known trademark, and he has known of it for 20 years.

Dick Lovelady, a dog trainer and kennel operator since 1952, testified that for better communication between the dog and the owner it is best to use the right language, and it is best to use one word commands such as "down" or "sit" or "lay" instead of "sit down" or "lay down"; that "Fido lay" is an appropriate dog command; that the most common names for dogs in the United States are Fido and Spot; that feeding a dog human snack food is inappropriate and not good for dogs; that he uses FIDO LAY dog treats in dog training to reward appropriate behavior, as a treat, and to release the stress caused by training, and he recommends them to his clients; that 'Fido Lay' is a common dog command[12]; that he

---

[12] In applicant's brief (p. 7) applicant requested that the Board take judicial notice that "the term 'lay' as related to a dog, i.e. FIDO, is a quite frequently utilized command addressed to dogs by their owners and dog lovers, after which the dog (Fido)

12

has used the command "lay" and he has instructed clients to use the term, although the term "down" is also used.  Mr. Lovelady also testified that in his experience the stores where human snack foods and dog treats are sold keep the areas very separate and distinct, that is, the dog food and human snack foods are in separate aisles, and he has never seen a rack of FRITO LAY products adjacent to the dog food area; and that he is aware of companies such as Ralston Purina and the Pet Company which sell both human and pet food.

Mr. Patrick Siano, vice-president of Patrick Siano Foods, a specialty food distributor in Memphis, Tennessee, testified that his father's company is a wholesaler to supermarkets, and that the company distributes approximately 1000 products to about 175-200 supermarkets in four states; that among the products it distributes are snack foods (Snyders of Hanover Pretzels); that the company does not distribute FRITO LAY products because those products are distributed through their own distribution system; that the Patrick Siano Foods company distributes applicant's products to supermarkets; that when first approached by Steven Scott about distributing FIDO LAY products he did not confuse the name with FRITO LAY; that he has personally visited about 100 of the supermarkets which are the company's customers;

is rewarded with a dog treat".  The Board declines to take such

that he has never seen dog food/dog treats adjacent to the human snack food area of supermarkets; that he has never seen human snack food display racks adjacent to the dog food/dog treat sections; that his company brings in floor spinner racks for display of the FIDO LAY products, but the store manager or the department manager within the store decides where the spinner racks are placed within the store; that dog food and dog treats are considered nonfoods by most retailers; that he has received no complaints of confusion between the products; that he associates FIDO with a dog's name; that vis-a-vis FRITO LAY, when he first heard of FIDO LAY, "the names weren't confusing, but I did think of Frito Lay," (Dep., p. 56); that he has been aware of the FRITO LAY mark for over twenty years; and that he is aware that Ralston Purina and the Mars company sell both human and pet food.

Mr. Stuart Herring is a computer operator at Blue Cross Blue Shield (and a co-worker of Steven Scott's wife), and was hired by applicant "as a researcher and consultant on aspects of language" (Dep., pp. 8-9) for this case. He testified as to things such as several dictionary definitions; grammatical uses of certain words; and that "Fido" is a familiar name for a dog, "lay" means to put or

---

judicial notice. See TBMP §712.

place in a horizontal position or position of rest, and that "frito" is a Spanish word meaning fried[13].

In rebuttal, and in accordance with the stipulation of applicant under Trademark Rule 2.123(b), opposer offered the affidavit testimony of Marthe deRaismes Drake, a legal secretary at opposer's law firm. She stated that on October 7, 1996 she shopped at a convenience store and at the checkout counter she saw and purchased a "candy item labeled 'Cookie Snack' consisting of cookie bits in the shape of dry dog food in combination with a piece of hard yellow candy shaped like a dog bone packaged in a plastic bowl made to appear like a dog dish." This was offered to prove that "others apparently manufacture and market human food made to appear like dog food" (Opposer's brief, p. 17).

Our determination of likelihood of confusion must be based on our analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. See In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

The first relevant *du Pont* factor is the similarity or dissimilarity of the marks. Opposer's various marks consist of the word FRITO with the word LAY or LAY'S, sometimes

---

[13] Additionally, The Random House Latin-American Spanish Dictionary (1997), and the Cassell's English-Spanish, Spanish-English Dictionary (1978) both indicate that "frito" means "fried". The Board may take judicial notice of dictionary definitions. See TBMP §712.01.

including a hyphen after the word FRITO, and sometimes including stylized lettering and a background design. While opposer's marks and applicant's mark both include the word LAY as the second word, there are obvious differences in the overall marks. Most importantly, the first word in opposer's marks is FRITO, whereas the first word in applicant's mark is FIDO. These two words are significantly different in connotation. FRITO is Spanish for "fried", while FIDO is a common name for a dog, such that one who does not even know the name of a dog may refer to it as FIDO. Also, applicant submitted evidence that its use of the term LAY specifically relates to the command to a dog to lie down. When LAY is combined with FIDO, the common meaning of LAY is apparent. Opposer submitted no evidence characterizing or explaining the origin and/or meaning of its marks FRITO LAY and FRITO LAY'S. Certainly, though, the word LAY combined with the Spanish word for "fried" does not connote a dog command, nor would LAY be likely to be perceived as meaning to lie down. Some of opposer's marks are FRITO LAY'S, with the second word in the possessive form. We agree with applicant that opposer's marks, FRITO LAY and FRITO LAY'S, and applicant's mark, FIDO LAY, are different in connotation, and the marks create different commercial impressions.

16

The second relevant *du Pont* factor is the relatedness of the goods, as described in the application or registration(s), or in connection with which opposer has shown prior use of its mark. Opposer's goods encompass a wide variety of snack foods, while applicant's goods are dog treats, and more specifically (as identified in applicant's application), "natural agricultural products, namely, edible dog treats". We note that opposer has a registration (Reg. No. 1,501,004-see footnote 8) for a variety of non food goods, such as houseware items, clothing items, accessory items, and stationery items; and that opposer licenses its marks for various nonfood goods listed earlier in this decision. However, none of opposer's collateral goods or licensed goods is related to dog treats. Thus, the parties' respective goods are simply not identical, nor otherwise related.

The next relevant *du Pont* factors are the channels of trade and the similarity of purchasers. The goods of the parties are sold in some of the same channels of trade, including, at least, supermarkets and grocery stores. Also, there is some overlap in purchasers inasmuch as individuals who own dogs may purchase snack foods as well as dog treats. Nonetheless, the evidence establishes that the snack food section and the pet food section of grocery stores and supermarkets are distinct and separate sections within the

stores. There is no "per se" rule that all products sold within supermarkets are related by virtue of the fact that they are sold in the same establishments. The Court of Customs and Patent Appeals stated in the case of Federated Foods, Inc. v. Fort Howard Paper Company, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976) as follows:

    A wide variety of products, not only from different manufacturers within an industry but also from diverse industries, have been brought together in the modern supermarket for the convenience of the customer. The mere existence of such an environment should not foreclose further inquiry into the likelihood of confusion arising from the use of similar marks on *any* goods so displayed. (Citation omitted) The means of distribution and sale, although certainly relevant, are areas of peripheral inquiry. The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks. (Emphasis in original.)

Even in the context of a supermarket carrying a wide variety of items, the particular nature of the goods must be considered. Here, the evidence of record does not show that snack foods are sold near pet foods, or are displayed in any manner such that consumers would assume a connection between the source of the parties' respective products.

We acknowledge that both opposer's snack foods and applicant's dog treats are inexpensive and may be purchased on impulse. However, these factors are diminished in importance in the context of this particular case because the parties' respective products are so different in nature.

The next *du Pont* factor we look at in this case, the fame of the opposer's marks, is unquestionably established in opposer's favor. With recent annual sales exceeding $6 billion dollars, recent annual advertising figures of $80 million, and opposer's products in up to 90% of U.S. households, there is no question that opposer has established the fame of its involved marks for its snack and other food products. Thus, opposer's marks "enjoy a wide latitude of legal protection." See Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

It is applicant's position that opposer's marks are famous for a variety of human food products, but that the fame of opposer's marks does not extend beyond that field, and that consumers are not likely to be confused vis-a-vis the mark FIDO LAY on "natural agricultural products, namely dog treats." There is no evidence of record herein which shows any use or public recognition of opposer's marks in the pet food industry. To the contrary, the record is clear that opposer makes no pet foods or dog treats, and currently does not license any such products. The fact that a few witnesses testified that they are *personally* aware of companies that produce both human and pet foods (e.g., Ralston Purina, Quaker, Pet Company), is not persuasive evidence that the public might assume a connection or

19

association of opposer with pet foods, particularly in view of the fact that there is no evidence that these manufacturers use the same or similar product marks on human food and pet food.

We are well aware of several cases from the U.S. Court of Appeals for the Federal Circuit relating to the importance of the "fame" factor, and we have certainly accorded weight to this factor in our determination of the case now before us. However, the test for likelihood of confusion requires the Board to consider the evidence on all the relevant factors. See Kenner Parker Toys, supra. The line of cases in which the U.S. Court of Appeals for the Federal Circuit found "fame" to weigh heavily in the balance of *du Pont* factors--and in which the Court found confusion likely--generally involved either the same or closely related goods or services. See Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983) (GIANT FOOD, SUPER GIANT, GIANT and design and GIANT FOOD and design for retail grocery store and supermarket services and private label food products and GIANT HAMBURGERS and design for hamburger and hot dog sandwiches and milk shakes for consumption on or off the premises); Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984) (SPICE ISLANDS for teas and SPICE VALLEY for teas); Kimberly-Clark

Corporation v. H. Douglas Enterprises, Ltd., 774 F.2d 1144, 227 USPQ 541 (Fed. Cir. 1985) (HUGGIES for disposable diapers and DOUGIES for combination training pants and disposable diapers); Nina Ricci S.A.R.L. v. E.T.F. Enterprises Inc., 889 F.2d 1070, 12 USPQ2d 1901 (Fed. Cir. 1989) (NINA RICCI, and other marks, for perfumes, clothing and accessories, and a retail boutique store and VITTORIO RICCI for handbags, clothing items, and retail stores); Kenner Parker Toys, supra, (PLAY-DOH for modeling compound and FUNDOUGH for modeling compound and other accessories); and Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992) (CENTURY 21 for real estate brokerage services, insurance brokerage services, and mortgage brokerage services and CENTURY LIFE OF AMERICA for insurance underwriting services).

In the case now before the Board the goods are not identical or closely related. Moreover, the same Court stated in The University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc., 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983:

The fame of the University's name is insufficient in itself to establish likelihood of confusion under Section 2(d). "Likely...to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in

gross, which is contrary to principles of trademark law and to concepts embodied in 15 USC §1052(d).

Notwithstanding the fame of opposer's mark, the differences in the products are so great, and the differences in the commercial impressions of the marks so apparent, that consumers are not likely to believe these goods emanate from or are sponsored by the same source.

As the Court stated in the case of In re P. Ferrero & C.S.p.A., 479 F.2d 1395, 178 USPQ 167 (CCPA 1973), "The fact that one mark may bring another mark to mind does not in itself establish likelihood of confusion as to source"; and the Board stated in American Express Company v. Payless Cashways, Inc., 222 USPQ 907 (TTAB 1984), "The concept of likelihood of confusion means more than the likelihood that the public will recall a famous or well known mark upon seeing the same or similar mark used by another." That is, even if an applicant's mark might bring to mind the opposer's mark, this does not necessarily mean that consumers will be confused into believing that the two marks indicate the same source of origin. See also, Viacom International Inc. v. Komm, 46 USPQ2d 1233 (TTAB 1998); and Nestle Foods Corp. v. Kellogg Co., 6 USPQ2d 1145 (TTAB 1988).

Finally, there is no evidence of any bad faith by applicant in adopting his mark, FIDO LAY. The trade dress

22

of applicant's products does not resemble the trade dress of any of opposer's products, nor is there any promotional literature for applicant's products that suggests a connection to or play upon "FRITO-LAY" products.  In fact, we find credible applicant's explanation of the origin of his mark, relating to a common dog name and a dog command.  While the testimony does show that applicant was aware of FRITO LAY products for many years, applicant's awareness of opposer's marks for snack foods does not prove any ulterior motive or bad faith by applicant.  Mere knowledge does not necessarily amount to bad faith in adopting a mark.

Decision:  The opposition is dismissed.

J. D. Sams

P. T. Hairston

B. A. Chapman
Administrative Trademark
Judges, Trademark Trial and
Appeal Board